**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SOMO AUDIENCE, CORP.,<br><br>Debtor. | Chapter 11 (Subchapter V)<br><br>Case No. 21-10464 |

**DECLARATION OF ROBERT MANOFF PURSUANT TO LOCAL**
**BANKRUPTCY RULE 1007-2 AND IN SUPPORT OF**
**CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Robert Manoff, pursuant to 28 U.S.C. § 1746, do hereby declare under penalty of perjury under the laws of the United States of America that the following is true and correct to the best of my knowledge as of this 10th day of March, 2021:

1.    I am the CEO, Secretary, and co-founder of SoMo Audience, Corp., a Delaware corporation, the debtor and debtor-in-possession herein (the "**Debtor**"), and am generally familiar with the Debtor's day to day operations, business, financial affairs, and books and records.

2.    On March 11, 2021 (the "**Petition Date**"), the Debtor is commencing a case by filing a petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York, and electing treatment under Subchapter V (the "**Subchapter V Case**"). The Debtor is currently operating its business and managing its affairs as a debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108. To date, no creditors' committee has been formed as this is a Subchapter V Case, and no trustee or examiner has been appointed. Utilizing the Bankruptcy Code to reorganize its affairs, get a breathing space from numerous pending litigations,

and discharge its obligations to creditors offers the only avenue by which Debtor could hope to re-commence its business, which has mostly been in hiatus for the last 17 months.

3.     I submit this declaration (the "**Declaration**"), pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), to provide an overview of the Debtor, its business and the Subchapter V Case, as well as to support the Debtor's chapter 11 petition and the motions and applications seeking various types of relief upon commencement of the Subchapter V Case (collectively, the "**First Day Motions**"). I have been in a management position with the Debtor since it was founded in 2012, and as a result of my work with the Debtor, my review of relevant documents, and my discussions with others familiar with the Debtor, I am familiar with the Debtor's day-to-day operations, business affairs, financial affairs, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein, and all facts set forth in the Declaration are based on my personal knowledge, my discussions with others familiar with the Debtor, my review of relevant documents, or my opinion based on my experience and knowledge of the Debtor's operations and financial conditions. In making this Declaration, I have relied in part on information and materials that the Debtor's advisors have gathered, prepared, verified and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing the Declaration. I am authorized to submit this Declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

4.     This Declaration is divided into three parts. Part I provides background information about the Debtor, its business, capital structure, restructuring efforts, and the events leading up to the filing of the Subchapter V Case. Part II sets forth the relevant facts and considerations in

support of each of the First Day Motions. Finally, Part III provides the specific information

required by Local Bankruptcy Rule 1007-2 which is not otherwise covered herein.

## PART I
## The Debtor

**A.      History and Business of the Debtor**

5.      My partner, Todd Houck ("**Houck**"), and I have been in the internet advertising

business for approximately 20 years. We have worked together and created and sold companies in

this space and have been successful as a result of our ability to predict the next trend and to keep

our expenses down. In 2012, we founded the Debtor to expand our internet advertising reach to

mobile devices. From the inception of the business, I have served as the CEO and Secretary,

responsible for sales, business development, and finance. Houck has served as the COO,

responsible for tech, operations, and products. From the start, Houck and I were each 50% equity

owners of the corporation; although, shortly after the Debtor was founded, I transferred 80% of

my 50% ownership interest to the Robert Manoff 2016 Nevada Trust (the "**Nevada Trust**"). The

Debtor was founded as an "exchange" for ads on mobile devices. The Debtor, using algorithms

and software it developed, acts as an intermediator, connecting advertising platforms to website

and application publishers who can display their advertising. Our customers were the ad platforms

that aggregated the ads of hundreds or thousands of businesses, and we were able to display their

ads on the publishing sites or applications to generate revenue for our publishing partners. We

collected money from the advertising platforms and needed to pay our publishing partners for the

display of their ads. The Debtor was unique because we could handle up to one million queries per

second, which is very unusual for such a small company. Although our competitors were giants in

the industry, such as Google, because we were small and had a very low overhead, but a very

powerful platform, we could offer similar services to the traditional advertising platforms at a lower cost. As the business grew, we expanded our reach to desktop, streaming, and digital out of home advertising.

6.      From the beginning, our strength was our ability to bring a laserlike focus to one underserved segment of the industry as well as to keep our expenses down. We avoided unnecessary expenses like flashy offices and bloated staff. This allowed the Debtor to succeed in an industry otherwise dominated by heavyweights. The Debtor from the start grew year-over-year, increasing its profitability each year. At its peak in 2018, the Debtor did approximately $18 million in topline revenue and had 14 employees, including myself and Houck.

7.      Although the Debtor eschewed debt, to keep up with demand and grow, we entered into a line of credit with JP Morgan Chase, N.A. ("**Chase**") with a maximum credit limit of $1.25 million. It is important to understand that the actual advertisers pay the advertising aggregators, who pay us. From what we are paid, we need to pay the ad publishers for publishing the ad, which is approximately 70% of what we receive from the ad platforms. Our customers have 60-day net payment terms, but not all of our publishing vendors do. Accordingly, we were often called upon to pay the vendor before we had received payment from the customer. In order to continue to grow under this model, we needed a line of credit. The Chase line of credit is secured by most of the assets of the Debtor. Houck and I each personally guaranteed the line of credit. Our guarantees were unsecured. In 2019, Chase asked for a guarantee by the Nevada Trust. Houck and I understood that said guarantee was to be in place of Houck's and my personal guarantees. We, therefore, provided a guarantee from the Nevada Trust. A year later, when we still had not received any paperwork cancelling our personal guarantees, we inquired in writing of our banker whether the personal guarantees were still in effect. Our Chase banker assured us by email that the personal

guarantees of Houck and myself were cancelled, and only the Nevada Trust guarantee was in force. It is my understanding that Chase now takes the position that the guarantees of myself, Houck, and the Nevada Trust are all valid and enforceable. Houck and I dispute this. As of the Petition Date, the credit line was maxed out.

8.      The Debtor has no secured debt other than the Chase line of credit. It has in the past year had to borrow money from Houck, myself, and our family and friends to keep the business going. I and my family and friends are owed approximately $18,350. Houck and his family and friends are owed approximately $20,890. In addition, Houck and I each have deferred salary payments when the Debtor could not afford to pay us. We are each owed approximately $25,000 in deferred salary. As detailed below, the Debtor has also received the proceeds from two Paycheck Protection Plan loans ("**PPP**"), which we expect to be forgiven.

**B.      Events Leading to the Chapter 11**

9.      In 2018, the Debtor was doing better than ever. In the second half of that year, a company called Verve Wireless, Inc ("**Verve**") became a customer. Verve was an advertising platform that aggregated ads from hundreds of small businesses, and then used our platform to place those ads with publishing sites. Our relationship with Verve was very successful, and in a very short time, it became our largest customer. In November 2018, it booked $800,000 of business in one month. In December 2018, it booked $1.2 million in one month. In retrospect, we should not have allowed such a large percentage of our business to be with one customer, but at the time, they were paying regularly and we were excited about the relationship and discussing various other strategic opportunities for the Debtor with Verve.

10.     Since our payment terms are net 60 days, the business that Verve booked in November did not need to be paid until February 1. It was paid reasonably timely. The business

booked in December did not need to be paid until March 1, 2019. When that date came, Verve indicated it needed a little more time. This was not particularly alarming, as, January and February are traditionally the worst months for digital advertisers. Since Verve had paid all previous bills reasonably timely, we were willing to work with them, and we continued to book large amounts of business with them, business which would not be due and payable for 60 days.

11.     By Spring 2019, we realized that we had a serious payment problem with Verve. At about the same time, we were approached by another company, IZON Network, Inc. ("**Izon**") which was interested in purchasing the Debtor for approximately $3 million in cash and $13 million in stock. This offer was very attractive to the Debtor because it would allow the Debtor to pay all of its outstanding accounts payable and satisfy the Chase line of credit in full, in addition to providing a return to the shareholders. Negotiations progressed, and by late April or early May 2019, we had signed a letter of intent and believed that Izon was purchasing the Debtor. In the meantime, we had made the decision to cut off Verve, but Izon strongly objected to our doing so. They indicated that they needed to keep the sales figures up in order to obtain financing for the transaction, and felt that they would deal with any collection issues after the transaction closed. At their insistence, we continued to do business with Verve, and the Verve receivable continued to grow.

12.     At about the same time, we started to develop a collection problem with a long time client, Vdopia, Inc. ("**Vdopia**"). Vdopia had offices in San Francisco and India, and we had done business with them on and off for a number of years. Suddenly, their payments became slower, and eventually they owed us approximately $165,000, at which point they simply disappeared and stopped returning any communications with the Debtor. In February 2020, as required by our contract, we initiated an arbitration against Vdopia. We received an arbitration award in the amount

of $166,170.91 with interest from May 20, 2020, at 10% per annum, and with costs and disbursements, which award has subsequently been entered as a judgment on March 3, 2021, by the Supreme Court, New York County, for $179,741.95. The Debtor will continue its efforts to collect from Vdopia, but the nonpayment by Verve and Vdopia made it increasingly difficult to pay our vendors, and some vendors started to refuse to provide service to us until they were paid. Once the Chase line of credit was maxed out, there was very little we could do to raise funds to pay the publishing sites. Our business had always relied on our excellent relationships with the publishing sites, but we were testing those relationships to their limits.

13.      In the meantime, Izon went out to their bankers to finance the $3 million cash portion of the purchase of the Debtor. Houck and I participated in a presentation to their Canadian bankers. When the bank saw that we had a $2 million receivable from Verve that was 90 days past due as part of a $3 million cash transaction, they refused to provide the financing. Izon continued to try for the next six months to obtain financing, but could not do so because of the Verve receivable. In late 2019, Izon reluctantly walked away from the deal.

14.      While we were waiting for Izon to obtain financing, we cut off Verve as a client in July 2019. By that time, however, they owed us approximately $2.2 million. I continued to hound their CEO and COO, who both promised payment, but in October 2019, with no payment in sight, the Debtor brought suit against Verve. Initially, Verve contested jurisdiction, but ultimately, Verve did not defend the suit, and in June 2020, we won a default judgment for $2,322,459.88, with interest from February 12, 2020, at 9% per annum, plus $37,125.82 in costs and attorney fees, which judgment has subsequently been certified on June 30, 2020, by the Supreme Court, New York County, in the amount of $2,439,185.63. The Debtor found out later that while the suit was pending, Verve purported to have done an assignment for the benefit of

creditors in California in January 2020, with no notice to the Debtor or the Court. Purportedly, Verve sold all of its assets to a German company for an amount insufficient to provide any distribution to unsecured creditors. The Debtor has been very suspicious of the alleged assignment for the benefit of creditors, of which creditors were not notified, and is evaluating whether to pursue the alleged German buyer for collection.

15. The Debtor's business is only as strong as its relationships with publishing sites, and without the ability to pay such vendors, it was cut off from using them one by one. Several have instituted collection lawsuits against the Debtor. Once Izon pulled out, Debtor was left with customers, but no ability to place their ads for them on most sites due to nonpayment to such sites. The business shrivelled from over $18 million a year to about $6,500 per month. The future looked bleak, but just when the Debtor learned that it would have great difficulty collecting its judgment from Verve due to the alleged assignment for the benefit of creditors, a public company came forward and offered to buy the Debtor if Debtor went through a bankruptcy proceeding.[1] The purchase price was sufficient to satisfy secured debt in full and offer a reasonable dividend to unsecured creditors. Management was ecstatic and worked very hard with the potential buyer on both a business plan for going forward, as well as all of the details of the sale. The prospective purchaser went into minute detail of what needed to be in the bankruptcy plan of reorganization, the filing documents, the cash collateral order, etc. As a result, the negotiations went on for months, and the majority of Management's time and attention from July through December, 2020, was spent on this transaction. Suddenly, in December 2020, as documents were being finalized, the prospective purchaser announced that it was not going through with the transaction. No reason was ever given. During the course of the negotiations, Debtor turned down a potential $500,000

---

[1] As the prospective purchaser was a public company, and the fact that they made a bid for Debtor has not been publicly disclosed, the Debtor is not identifying the purchaser by name at this time.

contract which would have conflicted with the proposed sale. Immediately after the buyer walked away, Debtor tried to revive the transaction, but was not successful in doing so.

16.     In the course of developing a business plan for this potential purchaser, the Debtor decided that to strengthen its business, it needs to pivot to a new business model concentrating on digital advertising on streaming TV, which is referred to in the industry as "CTV", and digital out of home advertising, such as advertising on elevator screens, taxi screens, retail establishment screens, bars, etc. Such advertising is referred to in the industry as "DOOH". The Debtor's existing technology is compatible with CTV and DOOH. I and my partner believe that CTV and DOOH are the future of the digital advertising industry, and we believe we can successfully reorganize focusing on these market segments because they have higher revenues, better profit margins, and involve a different set of publishers than those with whom we have outstanding balances. We plan to use the Subchapter V Case to refocus our business on these segments and to find a strategic partner, merger, joint venture or sale that will allow the restructured business to move forward. We already have parties lined up on both the customer and vendor side for these business segments, but they are reluctant to do business with us unless we file a bankruptcy proceeding, because, they are afraid our assets will be foreclosed upon before we can provide a deliverable to them. I believe, however, that we will be able to obtain business quickly after a filing and demonstrate our proof of concept to make us an attractive purchase or strategic partner for another company. To this end, as discussed further below, we have engaged Sherwood Partners to help us find the transaction which will maximize value to the estate. Learning from our past, going forward we do not wish to be a middleman like we were before, but rather our contracts will be directly with the vendors, who will pay us, and it will be up to the vendors to collect from the client advertisers. This business model is known as Software as a Service, or "SAAS".  Our successful business was brought down

by an inability to collect for our services, and we believe that by reorganizing on the SAAS model, we will greatly reduce collection risk. Prior to the Petition Date, we were being inundated with lawsuits and collection letters from vendors, and Chase was demanding that we come up with a payment plan and cease spending any cash. Accordingly, while we believe we have outstanding technology and a business plan that will lead to success, we could not pivot to our new business plan and accomplish a restructuring of the Debtor without the breathing space afforded by this Subchapter V Case.

## C.    The Debtor's Capital Structure

17.    The Debtor has assets of approximately $437,993.64 consisting mainly of aged accounts receivable of dubious collectability; and liabilities, many of which are disputed, of approximately $4,426,241.94. The Debtor has little, if any, tangible assets, except for some used computer equipment and office furniture, which has no value. In order to save money, since all employees have been working from home during the pandemic anyway, the Debtor recently gave up its office space, which it was not using. The lease expired as of March 31, 2021. The only tangible assets are the books and records of the Debtor which have always been kept at the Debtor's accountants' offices in Manhattan.

18.    As discussed above, the Debtor has secured debt of approximately $1,286,113 owing to Chase, which is secured by most of its assets. The Debtor believes that as of the Petition Date, Chase is undersecured. The Debtor has no other secured debt.

19.    In addition to the secured debt, the Debtor has borrowed money twice pursuant to the PPP loan program offered by the federal government during this pandemic. It owes $164,872 to Chase for a PPP loan obtained through Chase. It also owes $79,200 to Investor Bank for a PPP loan obtained through Investor Bank. Debtor believes that it has met the criteria which will

ultimately allow such PPP loans to be forgiven. The only other obligation for borrowed debt is to friends and family of myself and Houck as outlined above in paragraph 8.

20.     The Debtor has one class of common stock, of which 999,800 shares are outstanding. 499,900 shares are held by Todd Houck. 99,980 shares are held by myself, and 399,920 shares are held by the Nevada Trust of which I am the grantor. The Debtor has no outstanding securities which are publicly held.

## PART II
## First Day Motions

**A.     Debtor's Applications to Retain Professionals[2]**

21.     In furtherance of this Subchapter V Case, the Debtor expects to file a number of motions and applications on or about the same day as the Petition Date. I am referring to these pleadings as "First Day Motions", although, I understand that these pleadings do not have the urgency associated with typical first day motions. Nonetheless, I felt it was important to provide the court with my rationale for filing these First Day Motions. I have reviewed each of these First Day Motions and proposed orders (including the exhibits thereto) and the facts set forth therein are true and correct the best of my knowledge, information, and belief. Moreover, I believe that the relief sought in each of the First Day Motions is vital to enable the Debtor to transition into Chapter 11 and to maximize value during the Subchapter V Case. I have had the opportunity to ask my advisors about the customary practice with respect to First Day Motions and believe that I understand the rationale for all of the pleadings.

---

[2] The Debtor intends to review all of the professional retention applications with the US Trustee prior to filing them with the Bankruptcy Court. Accordingly, there may be a slight delay before they are actually filed with the Court.

### 1. General Bankruptcy Counsel

22.     Debtor is filing an application for entry of an order authorizing the employment of Mayerson & Hartheimer, PLLC ("**M&H**") as its general bankruptcy counsel, effective as of the Petition Date.

23.     I have been working with M&H for about a year now and know them to be highly competent bankruptcy counsel. In addition, they are familiar with the Debtor, its books and records, its creditors and its business plans. I believe that their knowledge of the Debtor and the Bankruptcy Code is critical to a successful outcome of this Subchapter V Case. I believe that their fees are in line with, or less than, the fees of bankruptcy professionals with similar credentials. Accordingly, I believe that it is in the best interests of the Debtor, its estate and its creditors to have the services of M&H.

### 2. Financial Advisor and Sales Agent

24.     Debtor is filing an application for entry of an order authorizing the employment of Sherwood Partners, Inc. ("**Sherwood**") as its financial advisor and sales agent, effective as of the Petition Date.

25.     I have been working with Sherwood as a financial advisor for several months.  In that capacity, they have helped to prepare the Debtor's petition, schedules, and statement of financial affairs. In doing so, they have become very familiar with the books and records of the Debtor, and have worked closely with management. We have been very pleased with the experience, and would like to continue to be able to benefit from their expertise as financial advisor. It is my understanding that they have considerable experience as a financial advisor and sales agent in bankruptcy proceedings all over the country.

26.     In the course of helping us prepare for bankruptcy, Sherwood, at my request, spoke to me about acting as sales agent. We particularly liked Sherwood's approach, because they were not wed to a 363 sale, but offered to explore attracting a strategic investor and/or joint venture or merger partner, in addition to exploring a sale. I feel that this approach is less formulaic than other potential sales agents, and is the best approach to maximize value, and therefore I have asked Sherwood to serve as our sales agent. I am advised that their fees both as a financial advisor and as a sales agent are reasonable and are at or below market for these types of services. I believe that having the right sales agent is absolutely critical to the outcome of this case, and having worked with Sherwood for several months, I believe that they are indeed the right sales agent. Moreover, because of their intimate knowledge of the Debtor gained from preparing our petition, schedules, and statement of financial affairs, they are prepared to hit the ground running, and I believe that, accordingly, they will be able to present the Debtor with a proposed transaction quicker than any other sales agent. For these reasons, I believe that hiring Sherwood as our financial advisor and sales agent is in the best interests of the Debtor, its estate and its creditors.

### 3. **Special Litigation Counsel**

27.     Debtor is filing an application to retain Feder Kaszovitz ("**Feder**") as special litigation counsel. Feder has been the Debtor's litigation counsel for a number of years, and I believe that they have provided the Debtor with outstanding counsel at a reasonable price.  I have complete confidence in their expertise as litigators.

28.     Feder has been representing us in a number of litigations, mostly having to do with money that is either owed to us or owed by us. They have been representing us against both Verve and Vdopia, and are poised to continue collection efforts against those two large debtors. In addition, there exists complicated litigation with a disgruntled ex-employee. Feder has been

involved in these litigations for quite some time, and the purpose of this application is to allow them to continue as special litigation counsel to represent the Debtor on these matters.   Replacing their knowledge of the cases and getting someone else up to speed would be prohibitively expensive for the Debtor, and would also cause us to lose the institutional knowledge that Feder has already built up concerning these matters. To the extent that these matters continue in bankruptcy, whether in bankruptcy court or another jurisdiction, we would want Feder to continue to represent us. I believe we also need them to advise our general bankruptcy counsel concerning any claims which may be made by these litigation parties. I believe that with Feder's knowledge of the facts combined with their litigation expertise, that this will be the most cost-effective way for the Debtor to continue, as well as providing us with the greatest likelihood of success, and thus their retention is in the best interests of the Debtor, its estate and its creditors.

### 4. Accountants

29.      The Debtor is filing an application to retain Chiong & Wan ("**C&W**") as accountants to the Debtor. C&W have been our accountants since the inception of the Debtor in 2012.They have been instrumental in our obtaining PPP loans and a tax refund, all of which were critical to our survival over the last year. In addition, our only physical assets, our books and records, are located in their offices, and they are responsible for maintaining our books and records. They have worked on bankruptcies before, and assure me that they are familiar with the process of closing the debtor's books, opening new books and accounts for the debtor-in-possession, opening new bank accounts, and the like. As I do not have experience in these areas, I will need to rely heavily on them. In addition, I will need them to continue to prepare our tax returns throughout the bankruptcy. We may also use their help in preparing monthly operating reports, and other materials required for the Court, but we will be careful to ensure that there is no

duplication with any of the work done by Sherwood as our financial advisor. As CPA's, C&W is equipped to perform certain services for the Debtor which Sherwood cannot perform, such as preparing our tax returns.

30.     I believe it is of critical importance to continue to use their services during the bankruptcy. Not only will their knowledge of bankruptcy combined with their knowledge of our books and records ease our transition into bankruptcy, but looking ahead, their familiarity with the company will ease our transition out of bankruptcy and back to normal operations. For these reasons, I believe it is essential for the Debtor, its estate and its creditors, that we continue to have the use of their services.

## C.     Case Procedures Order

31.   The Debtor is requesting the entry of an order establishing certain administrative procedures for this Subchapter V Case. I am advised that this is a fairly standard practice in bankruptcy and will eliminate any uncertainty over who needs to be served, what is the time period for notice, how to schedule hearings, and the like. I believe that in the long run, it will save the debtor both money and anxiety to have certainty concerning these issues. Based on my discussions with professionals, I believe that the procedures in the proposed order are fair and reasonable, and provide adequate notice of anything the Debtor or another party may propose in this Subchapter V Case.

32.     I am advised that our creditor matrices are extremely all-encompassing to ensure that any party in interest gets notice of the filing of the bankruptcy. Once the bankruptcy is filed, however, and interested parties can file a notice of appearance requesting service, it would be unnecessary and extremely burdensome and expensive for the Debtor to serve all of the parties on the creditor matrices with every document filed in the Subchapter V Case. Accordingly, the Debtor

is suggesting a streamlined procedure which I believe will still give all interested parties adequate notice of all filings in the case, but will not break the bank. I, therefore, believe that the proposed case management order strikes an appropriate balance between giving parties in interest notice and saving the Debtor from unreasonable expenses. Accordingly, I submit that the relief requested is in the best interests of the Debtor, its estate, and its creditors.

### D. Motion for Authority to Pay Prepetition Wages and Employee Obligations

32.    In the past year, there have been times when payrolls are late, which has caused severe morale problems. In addition, certain employees, myself included, have foregone paychecks in order to keep the Debtor operating. This has caused hardship for our employees and their families. In addition, we cannot be certain that all paychecks which were issued prepetition have cleared our bank. It would be difficult for our outside payroll service to differentiate between prepetition and postpetition payroll.

33.    I am advised that there is an administrative priority for wages and obligations to employees, and that we are asking only to pay an amount which would not exceed the amount permitted by the administrative priority for any one employee. Furthermore, employees would be harmed if we cannot turn over amounts that have been withheld from their wages already to the appropriate authorities. I believe that the trust fund accounts are not property of the estate in any event, but I am concerned that the Debtor would suffer from poor morale if our employees were concerned about this or were not paid what is owed to them, and our existing benefit policies, such as accrued vacation days and sick days, were not continued seamlessly. Accordingly, I believe that it is in the best interests of the Debtor, its estate and its creditors, as well as its employees, to grant the relief requested to ensure that our few remaining employees remain happy and dedicated to a successful conclusion of this Subchapter V Case.

## PART III
## Information Required by Local Bankruptcy Rule 1007-2

34.     Local Rule 1007-2 requires certain information related to the Debtor, which is set forth herein. The information required by Local Rules 1007-2 (a) (1), 1007-2 (a) (6), 1007-2 (a) (7), 1007-2 (a)(9), and 1007-2 (a)(12) is set forth in Part I above.

35.     The Debtor submits that the information required by Local Rules 1007-2 (a) (2), 1007-2 (a) (3), 1007-2 (a) (8), and 1007-2 (a) (11) is not required because, as set forth in Part I, this case was not originally commenced under either Chapter 7 or Chapter 13; no committee of creditors has been organized prior to the Petition Date; none of the Debtor's property is in the possession or custody of any custodian, public officer, mortgagee, pledgee, destiny of rents, or secured creditor; and no seizure of the Debtor's property is imminent to the best of my knowledge.

36.     Pursuant to Local Rule 1007-2 (a) (4), **Schedule A** attached hereto lists the following information with respect to the holders of the twenty (20) largest unsecured claims against the Debtor, excluding insiders: the name, the complete address, the telephone number and/or email address of the party dealing with the account, the name (s) of the person (s) familiar with the Debtor's account if known, the amount of the claim, and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured, to the extent known to the Debtor.

37.     Pursuant to Local Role 1007-2 (A) (5), the Debtor submits that it only has one secured creditor, JP Morgan Chase, N.A. Chase is owed approximately $1,286,113 as of the Petition Date which is secured by most of the Debtor's assets. The value of the collateral as of the petition date is uncertain, but the Debtor believes that Chase is under secured. The address of the secured creditor is: JP Morgan Chase, N.A., Post Office Box 9001022, Louisville, KY 40290.

38.     As discussed in more detail in Part I, with respect to Local Rule 1007-2 (a) (9), the Debtor does not currently have any premises from which it operates its business, and the lease of

its former premises runs out on March 31, 2021. Each employee is working remotely from their own home during the pandemic.

39.        With respect to Local Rule 1007-2 (a) (10), the location of all of the Debtor's tangible assets, which consists of its books and records, is c/o Chiong & Wan, 485 Madison Avenue, Suite 1600, New York NY 10022. The Debtor does not hold any assets outside of the territorial limits of the United States.

40.        With respect to Local Rule 1007-2 (b)(1), in order to save payroll processing expenses, and because the few remaining employees are very stable, the Debtor went to a quarterly payroll period. As a result, the Debtor estimates that it will not be required to make any payroll payments in the 30-day period following the Petition Date. The estimated amount of weekly payroll to employees exclusive of officers, directors, stockholders, and partners is $2,250.

41.        With respect to Local Rule 1007-2 (b)(2)(A), the Debtor makes regular payroll payments to its two officers of $8,332 each per month. As discussed above, the Debtor is on a quarterly payroll, and accordingly does not anticipate making any cash payments to its officers in the next thirty days.

42.        With respect to Local Rule 1007-2 (b)(2)(C), the Debtor has paid a retainer of $35,000 to Sherwood Partners, Inc., against its services in the Subchapter V Case as financial advisor and sales agent.

43.        With respect to Local Rule 1007-2 (b)(3), **Schedule B** attached hereto provides a schedule of the estimated cash receipts and disbursements, including net cash gain or loss, as well as the obligations and receivables expected to accrue but remain unpaid (other than professional fees) over the next thirty days.

## CONCLUSION

I hereby declare under the penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as this Court deems just and proper.

Dated: March 10, 2021

SOMO AUDIENCE, INC.
Debtor and Debtor-in-Possession

By: _____
Robert Manoff
CEO and Secretary

# SCHEDULE A

<table>
<tr><td colspan="2">Fill in this information to identify the case:</td></tr>
<tr><td>Debtor name</td><td>SoMo Audience Corp.</td></tr>
<tr><td>United States Bankruptcy Court for the:</td><td>SOUTHERN DISTRICT OF NEW YORK</td></tr>
<tr><td>Case number (if known):</td><td>_____</td></tr>
</table>

☐ Check if this is an

amended filing

## Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31).  Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 140 Proof, Inc. 36 East 12th Street 2nd Floor New York, NY 10003 | Eric Ontman eric@acuityads.com (305)-515-0570 | Trade Debt | Disputed Subject to Setoff | | | $244,998.26 |
| 33Across Inc. 229 West 28th Street New York, NY 10001 | Chris Meredith chris.meredith@33across.com (917)-747-8829 | Trade Debt | Disputed Subject to Setoff | | | $46,202.91 |
| AdElement Inc. 33 Vincent Behan Blvd. Edison, NJ 08837 | Ravi Tarije ravi@adelement.com (646)-918-4092 | Trade Debt | | | | $121,050.35 |
| AdMedia 6320 Canoga Ave, Suite 200 Woodland Hills, CA 91367 | Inga Zubrytska Inga@admedia.com (800)-296-7104 ext. 232 | Trade Debt | Disputed Subject to Setoff | | | $45,614.84 |
| DeCenter Ads PTE. LTD 160 Robison Road #15-06 Pore Business Federation Ctr Singapore City, Singapore | Irina Lebrid finance@decenterads.com | Trade Debt | | | | $45,919.10 |
| EMX Digital, LLC 261 Madison Ave 4th Floor New York, NY 10016 | Brian Weigel Brian.Weigel@emxdigital.com | Trade Debt | Disputed Subject to Setoff | | | $42,592.67 |

Software Copyright (c) 1996-2021 Best Case, LLC - www.bestcase.com                                                                          Best Case Bankruptcy

| Debtor | **SoMo Audience Corp.** | | Case number *(if known)* | |
|---|---|---|---|---|
| | Name | | | |

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **Engage BDR** **9000 Sunset Blvd** **West Hollywood, CA 90069** | **Andy Dhanik** andy@engagebdr.com (310)-954-0751 x727 | **Trade Debt** | **Disputed Subject to Setoff** | | | **$110,132.01** |
| **Feder Kaszovitz LLP** **845 Third Avenue** **New York, NY 10022-6601** | **Murray Skala** MSKALA@FEDKAS.COM (212)-888-8200 | **Professional Fees** | | | | **$90,886.18** |
| **Fyber/Interactive** **POB 10409** **Petach Tikva 9003 ISRAEL** | **Offer Yehudai** offer.yehudai@fyber.com | **Trade Debt** | | | | **$474,657.30** |
| **InMobi** **475 Brannan Street Suite 420** **San Francisco, CA 94107** | **Michael Zatorski** michael.zatorski@inmobi.com | **Trade Debt** | | | | **$174,874.50** |
| **Investor Bank** **101 JFK Parkway** **Short Hills, NJ 07078** | **Joel A. Clarke** jclarke@investorbank.com (908)-388-1727 | **PPP Loan** | | | | **$79,200.00** |
| **JPMorgan Chase Bank, NA** **Collateral Mgmt Small Business** **PO Box 33035** **Louisville, KY 40232** | **Cori Macri** (908)-256-0739 | **Credit Card, PPP Loan, and undersecured portion of secured debt** | | | | **$225,810.09** *Plus undersecured portion of secured debt. |
| **Mobfox** **HaNehoshet St. 6** **Tel Aviv, Israel** | **Jebelyn De Jose** accounting@mobfox.com | **Trade Debt** | **Disputed Subject to Setoff** | | | **$398,659.18** |
| **OpenX Technologies, Inc** **888 E Walnut St 2nd Floor** **Pasadena, CA 91101** | **Maria Casas** maria.casas@openx.com (626)-466-1141 x 6048 | **Trade Debt** | | | | **$72,759.20** |
| **Rackspace** **One Fanatical Place City of Windcrest San Antonio, TX 78218** | **Maribel Cruz** Maribel.Cruz@rackspace.com | **Trade Debt** | | | | **$298,543.20** |
| **Rubicon (Magnite)** **12181 Bluff Creek Drive** **4th Floor** **Los Angeles, CA 90094** | **Tony Nguyen** tnguyen@rubiconproject.com (310)-207-0272 x108 | **Trade Debt** | | | | **$69,401.68** |

Software Copyright (c) 1996-2021 Best Case, LLC - www.bestcase.com                                                                                    Best Case Bankruptcy

| Debtor | **SoMo Audience Corp.** | | | | Case number *(if known)* | | |
|---|---|---|---|---|---|---|---|
| | Name | | | | | | |

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **Smaato Inc.**<br>**240 Stockton Street**<br>**10th Floor**<br>**San Francisco, CA**<br>**94108** | **Kevin Whitehair**<br><br>**kevin.whitehair@smaato.com**<br>**(650)-430-5517** | **Trade Debt** | **Disputed** | | | **$84,541.57** |
| **Spotxchange**<br>**(SpotX)**<br>**8181 Arista Place**<br>**Broomfield, CO**<br>**80021** | **Kelly McMahon**<br><br>**kelly@spotx.tv**<br>**(303)-507-3007** | **Trade Debt** | | | | **$66,588.98** |
| **StartApp**<br>**584 Broadway, Suite**<br>**1206**<br>**New York, NY 10012** | **Omri Barnes**<br><br>**omri.barnes@startapp.com** | **Trade Debt** | | | | **$99,039.56** |
| **The Media Trust**<br>**PO Box 8056**<br>**Mclean, VA 22106** | **Rikki Decker**<br><br>**rdecker@themediatrust.com**<br>**(301)-648-9751** | **Trade Debt** | **Disputed** | | | **$45,329.47** |

Software Copyright (c) 1996-2021 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

# SCHEDULE B

## Schedule B

## Estimated Thirty Day Cash Flow

### SoMo Audience Corp.

| | |
|---|---|
| Opening Cash Balance | $37,888.03 |
| Income from Operations | 12,500 |
| | |
| Total Cash: | $50,388.03 |
| | ========== |
| | |
| | |
| Cash Payments: | |
| AWS | ($4,400.00) |
| Slack | (      32.00) |
| GitHub | (      13.00) |
| | |
| Cash at end of Thirty Days : | $45,943.03 |
| | ========== |